UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────────┐
│ USDC SDNY                                │
│ DOCUMENT                                 │
│ ELECTRONICALLY FILED                     │
│ DOC #: _____         │
│ DATE FILED: September 30, 2014           │
└─────────────────────────────────────────┘
```

ACE AMERICAN INSURANCE COMPANY,

                          Plaintiff,

            v.

BANK OF THE OZARKS,

                          Defendant.

**MEMORANDUM**
**OPINION & ORDER**

11 Civ. 3146 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

This is a breach of contract and declaratory judgment action brought by Plaintiff

ACE American Insurance Company ("ACE") arising out of Defendant Bank of the Ozarks'

failure to honor ACE's draw request on a letter of credit issued by the Bank in favor of ACE.

(Cmplt. (Dkt. No. 1) ¶ 1)  Plaintiff has moved for summary judgment pursuant to Fed. R. Civ. P.

56.  (Dkt. No. 57)  For the reasons set forth below, Plaintiff's motion will be granted in its

entirety.

## BACKGROUND

**I.    THE BANK'S LETTER OF CREDIT**

ACE is an insurance company organized under Pennsylvania law.[1]  (ACE's

Statement of Undisputed Material Facts ("ACE R. 56.1 Stmt.") (Dkt. No. 59) ¶ 1)  Between May

---

[1] To the extent that this Court relies on facts drawn from the parties' Local Rule 56.1 statements,
it does so because the opposing party has either not disputed those facts or has not done so with
citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir.
2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule
56.1 statement, that fact will be deemed admitted.") (citations omitted).  Where the Defendant –
the party opposing summary judgment here – disagrees with the moving party's characterization
of the cited evidence, and has presented an evidentiary basis for doing so, this Court relies on the
its characterization of the evidence.  See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir.
2001) (court must draw all rational factual inferences in non-movant's favor in deciding
summary judgment motion).

1, 2006 and May 1, 2009, ACE issued general liability, automobile liability, and workers'

compensation and employee liability policies to Affiliated Foods Southwest, Inc. ("AFS"). (Id.

¶¶ 4-5) In connection with these policies, ACE and AFS entered into a contract dated May 1,

2006 (the "Collateral Agreement"), in which AFS agreed to establish a "clean irrevocable

evergreen letter of credit," naming ACE as beneficiary. (Id. ¶¶ 6, 43)

       At the request of AFS, the Bank of the Ozarks (the "Bank") – a state-chartered

bank organized under Arkansas law (id. ¶ 2) – issued a clean irrevocable evergreen letter of

credit ("Letter of Credit") on June 1, 2008, in the amount of $1,376,998, naming ACE as

beneficiary. (Id. ¶¶ 14, 18; see ACE Appendix (Dkt. No. 60-5), Ex. 4) The Letter of Credit is

addressed to ACE, as beneficiary, and provides as follows:

> By order of our client, Affiliated Foods Southwest, Inc., we hereby establish this
> Irrevocable Letter of Credit No. 0706035392 in your favor for an amount up to
> but not exceeding the aggregate sum of One Million Three Hundred Seventy Six
> Thousand Nine Hundred Ninety Eight Dollars ($1,376,998), effective
> immediately, and expiring at the offices of the Bank on June 1, 2009 unless
> renewed as hereinafter provided.
>
> . . . .
>
> Funds under this Letter of Credit are available to you against your sight draft(s),
> drawn on us, bearing the clause "Drawn under Credit No. 0706035392".
>
> . . . .
>
> This Letter of Credit sets forth in full the terms of our undertaking. Such
> undertaking shall not in any way be modified, amended or amplified by reference
> to any document or instrument referred to herein or in which this Letter of Credit
> is referred to or to which this Letter of Credit relates and any such reference shall
> not be deemed to incorporate herein by reference any document or instrument.
>
> . . . .
>
> We hereby agree with the drawers, endorsers and bona fide holders of drafts
> drawn under and in compliance with the terms of this credit that such drafts will
> be duly honored upon presentation to the drawee. The obligation of Bank of the

Ozarks under this Letter of Credit is the individual obligation of Bank of the Ozarks, and is in no way contingent upon the reimbursement with respect thereto.

. . . .

(ACE Appendix (Dkt. No. 60-5), Ex. 4 at 3-4; see ACE R. 56.1 Stmt. ¶ 27)[2]  The Letter

of Credit further provides that, "[e]xcept as otherwise expressly stated herein, this credit

is subject to and governed by the Laws of the State of New York and the 1993 revision of

the Uniform Customs and Practice for Documentary Credits of the International Chamber

of Commerce (Publication 500) [(the "UCP")] and, in the event of any conflict, the Laws

of the State of New York will control."  (ACE Appendix (Dkt. No. 60-5), Ex. 4 at 4; see

ACE R. 56.1 Stmt. ¶ 28)

In connection with the Letter of Credit, AFS entered into an agreement (the

"Customer Agreement") with the Bank.  (ACE R. 56.1 Stmt. ¶ 32; see ACE Appendix (Dkt. No.

60-9), Ex. 8)  Among other things, AFS agreed to immediately repay the Bank for any amounts

paid by the Bank under the Letter of Credit.  (ACE R. 56.1 Stmt. ¶ 35)  AFS also agreed that its

obligation to reimburse the Bank would not be affected by "any breach of any agreement

between [AFS] and the Beneficiary of the Letter of Credit . . . , even if [the Bank] has received

notice of same."  (ACE R. 56.1 Stmt. ¶ 36; ACE Appendix (Dkt. No. 60-9), Ex. 8 at 4)

## II.   AFS'S BANKRUPTCY AND THE PARTIES' EARLIER LITIGATION

On May 5, 2009, AFS filed a Chapter 11 bankruptcy petition in the United States

Bankruptcy Court for the Eastern District of Arkansas.  (ACE R. 56.1 Stmt. ¶ 23)  On July 17,

2009, AFS ceased all operations, and its bankruptcy case was later converted to a Chapter 7

liquidation proceeding.  (Id. ¶ 24)

---

[2]  Citations are to the page numbers as they appear on the ECF system.

On October 22, 2009, ACE filed a complaint against the Bank in this District alleging that it had not honored proper draw requests totaling $143,006.76. (ACE R. 56.1 Stmt. ¶ 57; see Ace Am. Ins. Co. v. Bank of the Ozarks, No. 09 Civ. 8938 (LAK), 2010 WL 1257327, at *1 (S.D.N.Y. Mar. 18, 2010))  After ACE filed that action, however, the Bank paid the draw requests that were the subject of the parties' dispute. (ACE R. 56.1 Stmt. ¶ 59)  The Bank then moved to dismiss or, in the alternative, for a transfer to the Eastern District of Arkansas. (Id. ¶ 60)

Judge Kaplan dismissed ACE's breach of contract claim as moot, except to the extent it sought interest. (Id. ¶ 61)  Judge Kaplan also dismissed ACE's declaratory judgment claim, based on his belief that the Bank would elect to terminate the Letter of Credit, thereby rendering declaratory relief unnecessary. (Id. ¶ 63)  Judge Kaplan observed, however, that "it is quite clear that there is a real disagreement between Ace and the Bank[,]" and that "[w]hile there are no outstanding draw requests, it seems likely . . . , in all the circumstances[,] that the brushfire that has broken out three times likely would erupt in flames again were there sufficient time." (Id. ¶ 62)  The Bank elected not to terminate the Letter of Credit, however, and it remains in effect. (Id. ¶ 65)

## III.   ACE'S MARCH 16, 2011 DRAW REQUEST

On March 16, 2011, ACE submitted a draw request to the Bank in the amount of $100,000. (Id. ¶ 78)  The Bank received the draw request the following day. (Id. ¶ 80)  In accordance with the terms of the Letter of Credit, the draft bore the clause "Drawn under Credit No. 0706035392," and was signed by an ACE officer. (Id. ¶ 81)  The Bank has refused to honor the draw request, however. (Id. ¶ 86)

On March 31, 2011, the Bank sent a letter to ACE acknowledging receipt of the sight draft but refusing to honor it. (ACE R. 56.1 Stmt. ¶ 86)  The Bank, stated that it was

4

refusing to honor the draw request because (1) "ACE [had] not submitted any supporting documentation to the Bank"; (2) "the amount requested was for a settlement of a claim made pursuant to an automobile policy"; and (3) ACE had not submitted documentation "evidencing that relief from the bankruptcy estate was granted to consummate the settlement, evidencing whether the bankruptcy estate agreed to the settlement amount, or evidencing that the bankruptcy court approved the settlement." (ACE Appendix (Dkt. No. 60-27), Ex. 26 at 3-4; see ACE R. 56.1 Stmt. ¶ 86)

Because many of the Bank's arguments in response to ACE's motion require an understanding of the contracts and events underlying ACE's draw request, the Court will now describe the circumstances of that draw request.

### A.    The Underlying Insurance Contracts

ACE issued an automobile liability policy to AFS (the "Automobile Policy") that became effective on May 1, 2008, and which had a term of one year. (ACE Appendix (Dkt. No. 60-6), Ex. 5 at 3, 6; see id. (Dkt. No. 60-7), Ex. 6 at 2 (stating that the Automobile Policy "covers from 05/01/2008 to 05/01/2009 12:01 am")) The Automobile Policy provides that ACE "will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'" (ACE Appendix (Dkt. No. 60-7), Ex. 6 at 13) Under the Automobile Policy, AFS's bankruptcy or insolvency does not relieve ACE of its obligations under the Automobile Policy. (Id. at 19)

As set forth in a notice of election prepared by ACE and a deductible endorsement that was attached to the Automobile Policy at its inception (Id. at 6, 37-38), the Automobile Policy was subject to a $100,000 deductible. (ACE R. 56.1 Stmt. ¶ 7; see ACE Appendix (Dkt. No. 60-7), Ex. 6 at 37) Thus, ACE's "obligation to pay damages under [the Automobile Policy]

5

applies only to the amount of 'losses' and 'allocated loss adjustment expenses' in excess of [$100,000]." (ACE Appendix (Dkt. No. 60-7), Ex. 6 at 37)

Under the Automobile Policy, ACE "may investigate and settle any claim or 'suit' as [it] consider[s] appropriate." (ACE R. 56.1 Stmt. ¶ 38)  In this regard, the deductible endorsement provides – in Item 4 – that ACE "will have the right at [its] sole discretion[ ] . . . [t]o pay any amounts within the Deductible Per Accident to settle any claim or 'suit.'" (Id. ¶ 39; ACE Appendix (Dkt. No. 60-7), Ex. 6 at 37)  Moreover, under the deductible endorsement, the parties agreed that ACE "will pay all sums the 'insured' becomes legally obligated to pay within the Deductible Per Accident" (ACE Appendix (Dkt. No. 60-7), Ex. 6 at 37), and that AFS "shall promptly reimburse [ACE] for any sums [ACE] may have paid under Item 4." (Id.; ACE R. 56.1 Stmt. ¶ 40)

**B.     The Collateral Agreement**

As noted above, ACE and AFS also entered into a Collateral Agrement, which required AFS to establish a "clean irrevocable evergreen letter of credit," naming ACE as beneficiary.[3] (ACE R. 56.1 Stmt. ¶¶ 6, 43)  The Collateral Agreement provides that, "[a]s security for payment of the Insured's Obligation, the Insured will provide to the Company, as beneficiary thereof, a clean irrevocable evergreen letter of credit . . . issued by a bank or other financial institution acceptable to the Company, and in an amount and form, acceptable to the Company. . . ." (ACE Appendix (Dkt. No. 60-8), Ex. 7 at 6)  Under the Collateral Agreement, AFS is required to pay "all . . . amounts the Insured is or may in the future be required to pay or reimburse in accordance with the terms and conditions of any Policies, . . . including without

---

[3]  In the Collateral Agreement, references to "the Insured" are to AFS and references to "the Company" are to ACE.  (ACE Appendix (Dkt. No. 60-8), Ex. 7 at 2)

limitation the Insured's share of Paid Losses within applicable Deductible(s) . . . and the Insured's share of Allocated Loss Adjustment Expense as specified in the applicable Policy and/or Notice of Election[,]" as well as "all amounts the Insured is or may be obligated to pay to other parties but which are paid by the Company. . . ." (Id. at 2-3)  "Paid Losses" are defined as "all amounts paid for losses (exclusive of Allocated Loss Adjustment Expense) under the Policies; provided, however, that the amount payable by the Insured for each Paid Loss shall be subject to the . . . amount of the deductible as provided in the respective Deductible Polcies, or . . . [the] amount of the loss limitation as provided in the respective Notice of Election." (Id. at 5)  "Allocated Loss Adjustment Expense" is defined as "such claim expenses, costs and any interest incurred in connection with the investigation, administration, adjustment, settlement or defense of any claim or lawsuit that the Company . . . directly allocates to a particular claim, whether or not a payment indemnifying the claimant(s) is made." (Id. at 3)

The Collateral Agreement provides that "[a]ll payments set out in this Agreement . . . must be made by the Insured by the Required Payment Date[,]" which is defined as "a date not later than fifteen (15) calendar days after the date of the Company's invoice for any amount billed by the Company to the Insured under the Insurance Agreements." (Id. at 3, 5)  The Collateral Agreement further provides that ACE "shall have the right to draw against the [letter of credit] and/or other collateral in each instance where the Insured's Obligation, or any portion thereof, for any reason is not fulfilled." (Id. at 7 (emphasis added); ACE R. 56.1 Stmt. ¶ 44)  The "Insured's Obligation" includes, among other things, claims ACE pays under the Automobile

Policy that are within the deductible, and include Allocated Loss Adustment Expense.[4]   (ACE

Appendix (Dkt. No. 60-8), Ex. 7 at 4-5)

### C.   ACE's Settlement of the Bowman Claim

On August 4, 2009, Lamar Bowman and his wife commenced an action in

Louisiana state court against ACE, AFS, and a truck driver employed by AFS.  (ACE R. 56.1

Stmt. ¶ 66)  The Bowmans could not proceed against AFS in light of the bankruptcy stay, but

they sought recovery directly from ACE under a Louisiana statute that permits direct actions

against insurers of bankrupt companies.  (Id. ¶ 67; see La. Rev. Stat. § 22:1269)  The Bowman

lawsuit stemmed from a multiple vehicle accident that occurred on August 12, 2008, in which

AFS's employee – a driver with a history of prior accidents – made a wide turn and struck the

---

[4]  The "Insured's Obligation" is defined as "all amounts that the Insured is or may in the future be required to pay or reimburse to the Company or any of its Affiliates, or any Claims Adjusting Service, pursuant to the Insurance Agreements, including the Policies, including Ultimate Losses as calculated by the Company."  (ACE Appendix (Dkt. No. 60-8), Ex. 7 at 4)

The "Insurance Agreements" are defined as "(i) all policies of insurance previously issued, now in force and/or hereafter issued (whether or not any such policies have expired or expire hereafter) by the Company or any of its Affiliates to the Insured and/or any of its Affiliates (individually or with any other named insured on such policy), including the Policies, and any Notices of Election and (ii) this Agreement, and (iii) any and all previously existing, now and/or hereafter created . . . deductible agreements, . . . claims servicing or adjusting agreements, . . . or any other agreement among the Company and/or any of its Affiliates and the Insured and/or any of its Affiliates . . . , together with all amendments, modifications, renewals, or extensions thereof, relating to any policies issued to the Insured or any of its Affiliates by the Company or any of its Affiliates."  (Id.)

The "Policies" are defined as, "collectively, Policies listed in any Notice of Election, and all renewals or extensions thereof, including any and all Deductible Policies . . . ."  (Id. at 5)

"Ultimate Losses" are defined as "losses incurred under the Insurance Agreements, including the Policies, within the respective deductibles or loss limitations plus future loss development and the amount of losses incurred but not reported, as estimated by the Company.  Ultimate Losses may include Allocated Loss Adjustment Expense to the extent specified in the applicable Notice of Election or Policies, as estimated by the Company pursuant to the applicable Notice of Election."  (Id.)

rear of another car, which in turn hit a second car that then hit a third car.  (ACE R. 56.1 Stmt. ¶ 68)  Given the driver's "failure to keep his vehicle under control" and "failure to watch where he was proceeding on the road," the claims adjuster determined that the likelihood of an adverse verdict was 100%.  (Id. ¶ 69 (quoting ACE Appendix (Dkt. No. 60-30), Ex. 29 at 3))

ACE retained counsel, who then obtained medical records for the Bowmans and arranged for an independent medical examination.  (ACE R. 56.1 Stmt. ¶ 71)  Although ACE had been advised that the lawsuit was "unwinnable[,]" its counsel managed to settle the case – after mediation – for $100,000.  (Id.)  ACE incurred expreses of more than $31,000 in defending against the Bowman lawsuit.  (Id. ¶ 72)

### D.   The Draw Request

In connection with the Bowman lawsuit, ACE prepared an invoice, dated March 1, 2011, stating that $100,000 was due for "Claim Payments – Settlement of Bowman Claim." (See ACE Appendix (Dkt. No. 60-25), Ex. 24 at 4-5)  On March 16, 2011, ACE submitted a draw request to the Bank in the amount of $100,000.  (ACE R. 56.1 Stmt. ¶ 78; ACE Appendix (Dkt. No. 60-26), Ex. 25 at 2)  As noted above, the request states that it is "Drawn under Credit No. 0706035392," and the request was signed by an ACE officer.  (ACE R. 56.1 Stmt. ¶ 81; ACE Appendix (Dkt. No. 60-26), Ex. 25 at 2-3)  To date, the Bank has not honored the draw request.  (ACE R. 56.1 Stmt. ¶ 86)

## IV.   ACE'S SUBSEQUENT DRAW REQUESTS

On October 12, 2012, ACE presented a draw request to the Bank in the amount of $99,649.17, most of which relates to the settlement of a personal injury lawsuit filed by Terrance Porter.  (Id. ¶ 96)  The Bank has likewise refused to honor this draw request.  (Id.)  The Porter claim arises from another automobile accident, in which an AFS driver was killed when his truck

9

rear-ended Porter's tractor on July 7, 2008. (Id. ¶ 102)  A claims adjuster fixed the settlement range at between $70,000 and $150,000, and the case was later settled for $100,000. (Id. ¶ 103)

On April 26, 2012, ACE presented a draw request to the Bank in the amount of $32,480.72, most of which relates to payment of a claim by Ted Morrow. (Id. ¶ 105)  The Bank has also refused to honor this draw request. (Id. ¶ 107)

## V.    PROCEDURAL HISTORY

ACE filed the Complaint on May 10, 2011.  (Cmplt. (Dkt. No. 1))  On October 25, 2011, the Bank moved to dismiss or, in the alternative, to transfer the case to the Eastern District of Arkansas. (Dkt. No. 11)  This Court denied the Bank's motion on August 3, 2012 (Dkt. No. 25), and the Bank filed its answer on August 20, 2012.  (Dkt. No. 27)

On November 25, 2013, ACE filed a motion for summary judgment, pursuant to Fed. R. Civ. P. 56.  (Dkt. No. 57)  ACE contends that the Bank has breached the Letter of Credit by failing to pay the March 16, 2011 draw request.  (See Pltf. Br. (Dkt. No. 58) at 20-22)  ACE seeks $100,000 plus interest on its breach of contract claim.  (Dkt. No. 57)  ACE further contends that it is entitled to a declaratory judgment that the Bank is obligated to honor and pay ACE the amount of any draw request under the letter of credit within seven banking days from the date of the Bank's receipt of such draw request, provided that ACE presents the Bank with a sight draft, drawn on the Bank bearing the clause Drawn under Credit No. 0706035392." (Dkt. No. 57)

## DISCUSSION

## I.    LEGAL STANDARD

Summary judgment is warranted when the moving party shows that "there is no genuine dispute as to any material fact" and that that party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment

purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In deciding a summary judgment motion, this Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Cifra, 252 F.3d at 216 (citations omitted). "'[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)) (alterations in original). Instead, the non-moving party must "'offer some hard evidence showing that its version of the events is not wholly fanciful.'" Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 200 (2d Cir. 2004) (quoting D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)).

"Although summary judgment is never lightly granted, letter of credit disputes generally present legal issues, rather than questions of fact, and are thus often appropriate for final adjudication upon submission of papers and affidavits." E & H Partners v. Broadway Nat'l Bank, 39 F. Supp. 2d 275, 280 (S.D.N.Y. 1998); see Banque Worms v. Banque Commerciale Privee, 679 F. Supp. 1173, 1178 (S.D.N.Y. 1988), aff'd, 849 F.2d 787 (2d Cir. 1988) (per

curiam) ("Actions concerning letters of credit are well suited to determination by motion for summary judgment because they normally present solely legal issues relating to an exchange of documents." ).

## II.     ACE'S DRAW REQUEST COMPLIED WITH THE LETTER OF CREDIT

ACE argues that it is entitled to summary judgment on its breach of contract claim because its draw request was proper under the Letter of Credit, and the Bank's affirmative defenses are without merit.  (Pltf. Br. (Dkt. No. 58) at 20-33)

### A.     The Nature of Letters of Credit

"Letters of credit are commercial instruments that provide a seller or lender (the beneficiary) with a guaranteed means of payment from a creditworthy third party (the issuer) in lieu of relying solely on the financial status of a buyer or borrower (the applicant)."  Nissho Iwai Europe v. Korea First Bank, 99 N.Y.2d 115, 119 (2002); see also 3Com Corp. v. Banco do Brasil, S.A.,171 F.3d 739, 741 (2d Cir. 1999).  "Three distinct contractual relationships are usually present when a letter of credit is issued":  (1) "the underlying agreement between the applicant . . . and the beneficiary . . ."; (2) the "contractual obligation . . . between the issuer . . . and its applicant . . . regarding the terms of the letter of credit and the extent of funds to be made available"; and (3) the contractual obligation between the issuer and the beneficiary – that is, the letter of credit itself – which embodies "the issuer's commitment to 'honor drafts or other demands for payment presented by the beneficiary . . . upon compliance with the terms and conditions specified in the credit.'"  Nissho Iwai Europe, 99 N.Y.2d at 120 (citing First Commercial Bank v Gotham Originals, 64 N.Y.2d 287, 294 (1985)).  "Fundamental to the letter of credit transaction is the principle that 'the issuing bank's obligation to honor drafts drawn on a letter of credit by the beneficiary is separate and independent from any obligation of its customer to the beneficiary under the sale of goods contract and separate as well from any obligation of

the issuer to its customer under their agreement.'" 3Com Corp., 171 F.3d at 741 (quoting First Commercial Bank, 64 N.Y.2d at 294); see also Rockwell Int'l Sys., Inc. v. Citibank, N.A., 719 F.2d 583, 587 (2d Cir. 1983) (letters of credit "represent separate contractual undertakings that are, in legal contemplation, wholly distinct from whatever performance they ultimately secure"); Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A., 707 F.2d 680, 682 (2d Cir. 1983) (bank's obligation to the beneficiary "is primary, direct and completely independent of any claims which may arise in the underlying sale of goods transaction").

   "This independence principle is predicated upon the fundamental policy that a letter of credit would lose its commercial vitality if before honoring drafts the issuer could look beyond the terms of the credit to the underlying contractual controversy or performance between its customer and the beneficiary." Township of Burlington v. Apple Bank for Sav., No. 94 Civ. 6116 (JFK), 1995 WL 384442, at *5 (S.D.N.Y. 1995) (citing KMW Int'l v. Chase Manhattan Bank, N.A., 606 F.2d 10, 16 (2d Cir. 1979)). "If the documents . . . comply with the terms of the credit, the issuer's duty to pay is absolute," regardless of what occurs in the related transaction. Alaska Textile Co. Inc. v. Chase Manhattan Bank, N.A., 982 F.2d 813, 816 (2d Cir. 1992).

   The Second Circuit has explained the "independence principle" as follows:

> The fundamental principle governing documentary letters of credit and the characteristic which gives them their international commercial utility and efficacy is that the obligation of the issuing bank to [honor] a draft on a credit when it is accompanied by documents which appear on their face to be in accordance with the terms and conditions of the credit is independent of the performance of the underlying contract for which the credit was issued.
>
> This independence principle infuses the credit transaction with the simplicity and certainty that are its hallmarks. The letter of credit takes on a life of its own as manifested by the fact that in credit operations all parties concerned deal in documents, not in goods, services, and/or other performances to which the documents may relate.

Id. at 815-16 (internal citations and quotations omitted).

13

The "independence principle" is embodied in both the UCP and Article 5 of New York's Uniform Commercial Code (the "UCC"). See UCP, Article 3 ("Credits, by their nature, are separate transactions from the sales or other contract(s) on which they may be based and banks are in no way concerned with or bound by such contract(s), even if any reference whatsoever to such contract(s) is included in the Credit."); id., Article 4 ("In Credit operations, all parties concerned deal with documents, and not with goods, services and/or other performances to which the documents may relate."); N.Y. U.C.C. Law § 5-103(d) ("Rights and obligations of an issuer to a beneficiary . . . under a letter of credit are independent of the existence, performance, or nonperformance of a contract or arrangement out of which the letter of credit arises or which underlies it, including contracts or arrangements between the issuer and the applicant and between the applicant and the beneficiary.").

Because of the "independence principle,"

> the issuing or confirming bank must honor a proper demand even though the beneficiary has breached the underlying contract, Centrifugal Casting Mach. Co. v. Am. Bank & Trust Co., 966 F.2d 1348, 1352 (10th Cir. 1992)[,] [and] even though the insolvency of the [bank's client] renders reimbursement impossible, Wood v. R.R. Donnelley & Sons Co., 888 F.2d 313, 318 (3d Cir. 1989); and notwithstanding supervening illegality, impossibility, war or insurrection, KMW [Intern. v. Chase Manhattan Bank, N.A.,] 606 F.2d [10,] 16 [(2d Cir. 1979)]. This independence principle is universally viewed as essential to the proper functioning of letters of credit and to their particular value. Centrifugal, 966 F.2d at 1352. The central purpose of the letter-of-credit mechanism would be defeated if courts felt free to examine the merits of underlying contract disputes in order to determine whether letters of credit should be paid. Id.

Semetex Corp. v. UBAF Arab Am. Bank, 853 F. Supp. 759, 770 (S.D.N.Y. 1994), aff'd, 51 F.3d 13 (2d Cir. 1995).[5]

---

[5] See Wood, 888 F.2d at 318 ("The issuer must pay even if both the customer and the beneficiary are insolvent, rendering it impossible to obtain reimbursement for the issuer's honor.") (citing Eakin v. Cont'l Ill. Nat'l Bank & Trust Co., 875 F.2d 114, 116 (7th Cir. 1989)

The duty of the issuing bank to pay upon the submission of documents which appear on their face to conform to the terms and conditions of the letter of credit is absolute, see Beyene v. Irving Trust Co., 762 F.2d 4, 6 (2d Cir. 1985), absent proof of intentional fraud on the part of the beneficiary.  See Voest-Alpine Int'l Corp., 707 F.2d at 686; see also Semetex Corp., 853 F.Supp. at 773 (describing "narrow" fraud defense).

**B.**    **The Parties' Obligations Under the Letter of Credit**

The Letter of Credit "is subject to and governed by the Laws of the State of New York and the 1993 revision of the Uniform Customs and Practice for Documentary Credits of the International Chamber of Commerce (Publication 500)," and provides that, "in the event of any conflict, the Laws of the State of New York will control."  (ACE Appendix (Dkt. No. 60-5), Ex. 4 at 4)

"An irrevocable Credit constitutes a definite undertaking of the Issuing Bank, provided that the stipulated documents are presented . . . to the Issuing Bank and that the terms and conditions of the Credit are complied with[,] . . . to pay at sight. . . ."  UCP Article 9(a)(i); see N.Y. U.C.C. § 5-102(a)(10) (defining a "letter of credit" as "a definite undertaking . . . by an issuer to a beneficiary at the request or for the account of an applicant . . . to honor a documentary presentation by payment. . ."); N.Y. U.C.C. § 5-108(a) ("Except [in instances of fraud], an issuer shall honor a presentation that, as determined by . . . standard practice . . . , appears on its face strictly to comply with the terms and conditions of the letter of credit."); N.Y. U.C.C. § 5-108 cmt. 8 (noting that "standard practice" includes practice set forth in the UCP). "Upon receipt of the documents the Issuing Bank . . . must determine on the basis of the

---

("Issuers of letters of credit take the risk of insolvency.  Standby letters of credit are especially designed to deal with insolvency, and the fact that this risk came to pass . . . does not afford [a bank] a good reason for balking [at satisfying a draw request].")).

documents alone whether or not they appear on their face to be in compliance with the terms and conditions of the Credit." UCP Article 14(b); see N.Y. U.C.C. § 5-108(a).

"Under New York law, in order to recover on its claim that the issuer wrongfully refused to honor its request to draw down on a letter of credit, the beneficiary must prove that it strictly complied with the terms of the letter of credit." BasicNet S.p.A. v. CFP Servs. Ltd., 120 A.D.3d 97, 105 (1st Dep't 2014) (citations omitted); see UCP Article 13(a) (requiring that banks "examine all documents stipulated in the Credit with reasonable care, to ascertain whether or not they appear, on their face, to be in compliance with the terms and conditions of the Credit"); id., Unofficial Comments (describing Article 13(a) as "the UCP's statement of the strict compliance rule"); N.Y. U.C.C. § 5-108, cmt. 1 ("The standard of strict compliance governs the issuer's obligation to the beneficiary and to the applicant. By requiring that a 'presentation' appear strictly to comply, the section requires not only that the documents themselves appear on their face strictly to comply, but also that the other terms of the letter of credit such as those dealing with the time and place of presentation are strictly complied with.").

"The strict compliance standard means that the conditions of the letter of credit must be complied with precisely by all parties; documents that are 'nearly the same' will not suffice." Ocean Rig ASA v. Safra Nat. Bank of N.Y., 72 F. Supp. 2d 193, 199 (S.D.N.Y. 1999) (quoting Voest-Alpine Int'l Corp., 707 F.2d at 683); see Alaska Textile Co., 982 F.2d at 816 ("Because the credit engagement is concerned only with documents, 'the terms and conditions of a letter of credit must be strictly adhered to. . . .'" (quoting Corporacion de Mercadeo Agricola v. Mellon Bank Int'l, 608 F.2d 43, 47 (2d Cir. 1979))). "'This rule [of strict compliance] finds justification in the bank's role in the transaction being ministerial, and to require it to determine the substantiality of discrepancies would be inconsistent with its function.'" Alaska Textile Co.,

982 F.2d at 816 (alterations in original) (quoting United Commodities-Greece v. Fid. Int'l Bank,

64 N.Y.2d 449, 455 (1985)).  Indeed, "[s]uch strict compliance standards allow the bank to act

quickly, freeing it of the obligation to inquire into the underlying contracts and dealings between

parties."  Ocean Rig, 72 F. Supp. 2d at 199 (citation omitted); see Alaska Textile Co., 982 F.2d

at 816 ("If the documents do comply with the terms of the credit, the issuer's duty to pay is

absolute, regardless of whether the buyer-account party complains that the goods are

nonconforming.").

     Where documents appear on their face not to comply with the terms and

conditions of the letter of credit, the issuer "may refuse to take up the documents" under the

UCP, while – with limited exceptions – the issuer "shall dishonor [the] presentation" under the

UCC.  See UCP Article 14(b); N.Y. U.C.C. § 5-108(a).  If the issuer "decides to refuse the

documents, it must give [the beneficiary] notice to that effect . . . without delay[,] but no later

than the close of the seventh banking day following the receipt of the documents."  UCP Article

14(d)(i); see N.Y. U.C.C. § 5-108(b).  "Such notice must state all discrepancies in respect of

which the bank refuses the documents. . . ."  UCP Article 14(d)(ii); see N.Y. U.C.C. § 5-

108(b)(3).

     Under both the UCP and the UCC, an issuer who does not comply with the

requirement to provide timely notice of discrepancies is precluded from asserting non-

compliance with the letter of credit as a basis for dishonor.  See UCP Article 14(e); N.Y. U.C.C.

§ 5-108(c); see also Hamilton Bank, N.A. v. Kookmin Bank, 245 F.3d 82, 89 (2d Cir. 2001)

("[T]he issuing bank 'must give notice [of its refusal] by telecommunication or, if that is not

possible, by other expeditious means, without delay but no later than the close of the seventh

banking day following the day of receipt of the documents,' and its 'notice must state all

discrepancies in respect of which the bank refuses the documents.' Failure to comply with Article 14's notice provisions, 'preclude[s the issuing bank] from claiming that the documents are not in compliance with the terms and conditions of the Credit.'" (quoting UCP Article 14(d)(i)-(ii), (e)) (second and third alterations in original)); Alaska Textile Co., 982 F.2d at 816 ("Issuers . . . must swiftly and carefully examine documents submitted for payment; . . . they are estopped from complaining about discrepancies they did not assert promptly."). Under the UCC, however, an issuer who does not comply may nevertheless assert fraud or forgery as a basis for dishonor. N.Y. U.C.C. § 5-108(d) ("Failure to give [proper] notice . . . or to mention fraud, forgery, or expiration in the notice does not preclude the issuer from asserting as a basis for dishonor fraud or forgery as described in subsection (a) of section 5-109. . . .").

C.     **Analysis**

ACE argues that (1) the Bank issued the Letter of Credit; (2) ACE submitted a draw request that complied with the terms of the Letter of Credit; and (3) the Bank wrongfully refused to pay, and did not provide timely notice of its dishonor. (Pltf. Br. (Dkt. No. 58) at 20-22)

The Court finds that ACE's draw request complied with the terms of the Letter of Credit. The Letter of Credit provides that "[f]unds under this Letter of Credit are available to [ACE] against [its] sight draft(s), drawn on [the Bank,] bearing the clause 'Drawn under Credit No. 0706035392.'" (ACE Appendix (Dkt. No. 60-5), Ex. 4 at 3; ACE R. 56.1 Stmt. ¶ 27) The Letter of Credit further provides that the Bank "agree[s] with the drawers . . . of drafts drawn under and in compliance with the terms of this credit that such drafts will be duly honored upon presentation to the drawee." (ACE Appendix (Dkt. No. 60-5), Ex. 4 at 4; ACE R. 56.1 Stmt. ¶ 27) Here, ACE's March 16, 2011 draw request states "Drawn under Credit No. 0706035392"

18

and is signed by an ACE officer.  (ACE Appendix (Dkt. No. 60-26), Ex. 25 at 3-4; ACE R. 56.1

Stmt. ¶¶ 78, 80, 81)  By its own terms, the Letter of Credit requires nothing more.

The Bank nevertheless refused to honor ACE's draw request.  (ACE R. 56.1 Stmt.

¶ 86)  On March 31, 2011 – three days after the expiration of the seven-day banking deadline set

forth in UCP Article 14(b) and UCC § 5-108(b) – the Bank stated that it would not honor the

draw request because (1) "ACE [had] not submitted any supporting documentation to the Bank";

(2) "the amount requested was for a settlement of a claim made pursuant to an automobile

policy"; and (3) ACE had not submitted documentation "evidencing that relief from the

bankruptcy estate was granted to consummate the settlement, evidencing whether . . . the

bankruptcy estate agreed to the settlement amount, or evidencing that the bankruptcy court

approved the settlement."  (ACE Appendix (Dkt. No. 60-27), Ex. 26 at 3-4; see ACE R. 56.1

Stmt. ¶ 86)

The Bank waived these defenses, however, because its response came more than

seven days after ACE submitted its draw request.  See UCP Article 14(e); N.Y. U.C.C. § 5-

108(c).  In any event, given that the Bank had issued a clean letter of credit (ACE R. 56.1 Stmt.

¶¶ 6, 18), which required no supporting documentation for payment of a draw request, the

Bank's refusal cannot be justified by reference to collateral documents or transactions.[6]  For all

---

[6]  To the extent the Bank argues that the Letter of Credit was a "standby" letter of credit, which
required ACE to certify that AFS had defaulted (see Def. Br. (Dkt. No. 64) at 11), that argument
is unavailing.  First, the Bank waived this argument – insofar as it rests on a theory of non-
compliance, rather than a theory of fraud – by failing to respond within seven banking days.  See
UCP Article 14(d)(i)-(ii), (e); N.Y. U.C.C. § 5-108(b)-(c); Hamilton Bank, N.A., 245 F.3d at 89.
Second, "it is well settled that ambiguities [in a letter of credit] will be construed strongly against
the issuer. . . ."  Ocean Rig, 72 F. Supp. 2d at 204 (citing Venizelos, S. A. v. Chase Manhattan
Bank, 425 F.2d 461, 466 (2d Cir. 1970); Bank of China v. Chan, 937 F.2d 780, 786 (2d Cir.
1991)).  Here, the Letter of Credit makes no reference to any collateral documents.  In fact, the
Letter of Credit's merger clause states that "[t]his Letter of Credit sets forth in full the terms of

of these reasons, the Court finds that ACE's draw request was proper and that the Bank was required to honor it.

### III.   THE BANK'S FRAUD DEFENSE FAILS

The Bank argues that it refused to honor ACE's draw request because honoring the request would have facilitated a "material fraud" under the UCC. More specifically, the Bank argues that ACE's actions with respect to the Bowman claim were improper, and that ACE therefore had no right to draw down on the Letter of Credit.

### A.   Applicable Law

"Fraud provides a well-established exception to the rule that banks must pay a beneficiary under a letter of credit when documents conforming on their face to the terms of the letter of credit are presented." Semetex Corp., 853 F. Supp. at 773 (citations omitted). This exception has been codified in the UCC, which provides:

> If a presentation is made that appears on its face strictly to comply with the terms and conditions of the letter of credit, but a required document is forged or materially fraudulent, or honor of the presentation would facilitate a material fraud by the beneficiary on the issuer or applicant . . . , [t]he issuer, acting in good faith, may honor or dishonor the presentation . . . ."

N.Y. U.C.C. Law § 5-109(a)(2). "[C]ourts must examine the underlying transaction when there is an allegation of material fraud, for only by examining that transaction can one determine whether a document is fraudulent or the beneficiary has committed fraud and, if so, whether the fraud was material." N.Y. U.C.C. Law § 5-109, Official Comment 1.

---

our undertaking[,]" which "shall not in any way be modified, amended or amplified by reference to any document or instrument referred to herein or in which this Letter of Credit is referred to or to which this Letter of Credit relates. . . ." (ACE Appendix (Dkt. No. 60-5), Ex. 4 at 3-4)  Thus, the Letter of Credit admits of no ambiguity. Even if the Letter of Credit were ambiguous – which it is not – any such ambiguity would be "construed strongly against [the Bank]." Ocean Rig, 72 F. Supp. 2d at 204.

Courts have observed, however, that "because the smooth operation of international commerce requires that requests for payment under letters of credit not be routinely obstructed by prepayment litigation, the fraud exception to the independence principle 'is a narrow one' that is only available on a showing of 'intentional fraud.'" BasicNet S.p.A., 120 A.D.3d at 111 (quoting All Serv. Exportacao, Importacao Comercio, S.A. v. Banco Bamerindus Do Brazil, S.A., 921 F.2d 32, 35 (2d Cir. 1990)).  Indeed, as one court has observed, "[i]nquiry into collateral contracts under the doctrine of fraud in the transaction would eviscerate the commercial utility of the letter of credit by increasing the potential for litigation and judicial interference."  Banque Worms, 679 F. Supp. at 1182-83.

These policies are reflected both in the case law and in the UCC's Official Commentary.  Official Comment 1 explains that – under the UCC – (1) "fraud must be found either in the documents or must have been committed by the beneficiary on the issuer or applicant"; (2) "fraud must be 'material'"; and (3) "[m]aterial fraud by the beneficiary occurs only when the beneficiary has no colorable right to expect honor and where there is no basis in fact to support such a right to honor."  N.Y. U.C.C. Law § 5-109, Official Comment 1.  As to what constitutes "material fraud," the Comment "indorses articulations such as those stated in Intraworld Indus. v. Girard Trust Bank, 336 A.2d 316 (Pa. 1975), Roman Ceramics Corp. v. People's Nat. Bank, 714 F.2d 1207 (3d Cir. 1983), and similar decisions[,] and embraces certain decisions under [the former provision] that relied upon the phrase 'fraud in the transaction.'"  N.Y. U.C.C. Law § 5-109, Official Comment 1; see N.Y. U.C.C. Law § 5-109, NYSBA Committee Report ("After numerous attempts to define 'fraud' or 'material fraud,' the Drafting Committee concluded that it was better to leave to the Official Comment and its reference to several cases an explanation of the types of fraud which would warrant injunctive relief.").  The

Comment explains that "[s]ome of these decisions have been summarized . . . in Ground Air

Transfer, Inc. v. Westate's Airlines, Inc., 899 F.2d 1269, 1272-73 (1st Cir. 1990)" and then

quotes – at length – a passage from that case:

> "We have said throughout that courts may not 'normally' issue an injunction
> because of an important exception to the general "no injunction" rule. The
> exception, as we also explained in Itek [Corp. v. First Nat'l Bank], 730 F.2d [19,]
> 24-25[ (1st Cir. 1984)], concerns 'fraud' so serious as to make it obviously
> pointless and unjust to permit the beneficiary to obtain the money. Where the
> circumstances 'plainly' show that the underlying contract forbids the beneficiary
> to call a letter of credit, Itek, 730 F.2d at 24; where they show that the contract
> deprives the beneficiary of even a 'colorable' right to do so, id., at 25; where the
> contract and circumstances reveal that the beneficiary's demand for payment has
> 'absolutely no basis in fact,' id.; see Dynamics Corp. of America [v. Citizens & S.
> Nat'l Bank], 356 F. Supp. [991,] 999 [(N.D. Ga. 1973)]; where the beneficiary's
> conduct has 'so vitiated the entire transaction that the legitimate purposes of the
> independence of the issuer's obligation would no longer be served,' Itek, 730 F.2d
> at 25 (quoting Roman Ceramics Corp. v. Peoples National Bank, 714 F.2d 1207,
> 1212 n.12, 1215 (3d Cir. 1983) (quoting Intraworld Indus., 336 A.2d at 324-25));
> then a court may enjoin payment."

N.Y. U.C.C. Law § 5-109, Official Comment 1 (emphasis in original) (quoting Ground Air

Transfer, 899 F.2d at 1272-73.

The cases cited in the Official Comment demonstrate a reluctance to examine the

contracts and transactions underlying a letter of credit. For example, in Intraworld, the court

explained that an "injunction is proper only if [the beneficiary] has no bona fide claim to

payment under the lease[,]" and that "neither the trial court nor this Court may attempt to

determine [the beneficiary's] actual entitlement to payment under the lease[,]" given that

"questions of rights and obligations under the lease are required by the lease to be determined" in

collateral litigation.  Intraworld, 336 A.2d at 325.  Thus, the court concluded that "if the

documents presented . . . are genuine in the sense of having some basis in fact, an injunction

must be refused."  Id.  In reaching this conclusion, the court observed that "[i]n light of the basic

rule of the independence of the issuer's engagement and the importance of this rule to the

effectuation of the purposes of the letter of credit, we think that the circumstances which will justify an injunction against honor must be narrowly limited to situations of fraud in which the wrongdoing of the beneficiary has so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation would no longer be served." Id. at 324-25.

In Roman Ceramics, the court reiterated the principles set forth in Intraworld, observing that "[t]he Pennsylvania Supreme Court . . . has already carefully weighed the competing strengths of the policies implicated by letters of credit . . . , recogniz[ing] the need for unfettered commercial transactions, which a letter of credit serves[, on the one hand, and] . . . the importance of the statutory exception to the general rule of independent obligations, when active fraud (as distinct from mere breach of warranty) is practiced by the beneficiary of the letter of credit." Roman Ceramics, 714 F.2d at 1213-14 (citing Intraworld, 336 A.2d 316). Additionally, the court noted that an issuer asserting fraud or forgery as a defense must demonstrate "that the claim of the party attempting to draw on the letter of credit 'has no basis in fact[,]' and thus this party 'has no bona fide claim to payment' at all." Id. at 1214 (quoting Intraworld, 336 A.2d at 325). The court further observed that "[t]his very strong showing is consistent with the concern of the Pennsylvania Supreme Court in Intraworld, where that court sought to limit severely those situations where 'the legitimate purposes of the independence of the issuer's obligation would no longer be served.'" Id. (quoting Intraworld, 336 A.2d at 324-25).

Courts interpreting the fraud exception under New York law have expressed similar views. The Second Circuit has explained that the fraud defense "authorizes dishonor only where 'a drawdown would amount to an outright fraudulent practice by the beneficiary.'" 3Com Corp.., 171 F.3d at 747 (quoting Recon/Optical, Inc. v. Government of Israel, 816 F.2d 854, 858 (2d Cir. 1987)). "[C]ourts have found such 'outright fraudulent practice' only rarely[,]"

23

however.  Semetex Corp., 853 F. Supp. at 774.  For example, "if a draft is accompanied by documents evidencing shipment of goods under a contract of sale, the doctrine permits dishonor not where a legitimate dispute exists concerning whether the goods conform to the underlying contract, but only where the goods are so obviously defective that the representation of shipment is plainly false."  3Com Corp., 171 F.3d at 747 (citing United Bank Ltd. v. Cambridge Sporting Goods Corp., 41 N.Y.2d 254, 256 (1976); Sztejn v. J. Henry Schroder Banking Corp., 177 Misc. 719, 720 (N.Y. Sup. Ct. 1941)).  Moreover, "if a draft is accompanied by a beneficiary's statement that the issuer's customer has materially breached the underlying contract, dishonor is permissible only where the beneficiary's claim of breach is clearly untenable."  Id. (citing Recon/Optical, Inc., 816 F.2d at 858; Ground Air Transfer, 899 F.2d at 1272-73; Roman Ceramics, 714 F.2d at 1214).  In other words, "[t]he [fraud] defense is available only where intentional fraud is shown, not where the party alleges improper performance or breach of warranty."  Semetex Corp., 853 F. Supp. at 773 (citing All Serv. Exportacao, 921 F.2d at 35).  Accordingly, the Second Circuit has held that summary judgment is appropriate even where "[a] legitimate dispute exists" concerning the beneficiary's right to draw under the letter of credit. 3Com Corp., 171 F.3d at 748.

Moreover, where an issuer has issued a so-called "clean" letter of credit, the Official Comment cautions that courts should be particularly "skeptical" of fraud claims.  See N.Y. U.C.C. Law § 5-109, Official Comment 3.  Specifically, Official Comment 3 provides:

> Whether a beneficiary can commit fraud by presenting a draft under a clean letter of credit (one calling only for a draft and no other documents) has been much debated.  Under the current formulation it would be possible but difficult for there to be fraud in such a presentation.  If the applicant were able to show that the beneficiary were committing material fraud on the applicant in the underlying transaction, then payment would facilitate a material fraud by the beneficiary on the applicant and honor could be enjoined.  The courts should be skeptical of

24

claims of fraud by one who has signed a "suicide" or clean credit and thus granted a beneficiary the right to draw by mere presentation of a draft.

N.Y. U.C.C. Law § 5-109, Official Comment 3.

"The issuer bears the burden of proving the fraud if it alleges fraud as a defense to an action for wrongful dishonor." Airline Reporting Corp. v. First Nat'l Bank of Holly Hill, 832 F.2d 823, 827 (4th Cir. 1987); see 3Com Corp., 2 F. Supp. 2d 452, 461 (S.D.N.Y. 1998) ("Because [the issuer] has failed to demonstrate that a [genuine issue of] material fact exists on the fraud affirmative defense, the plaintiff is entitled to judgment as a matter of law."), aff'd sub nom. 3Com Corp., 171 F.3d 739; Bank of Canton, Ltd. v. Republic Nat'l Bank of New York, 509 F. Supp. 1310, 1318 (S.D.N.Y. 1980) ("As the party defending against the claim for wrongful dishonoring of drafts drawn under a letter of credit, [the issuer] has the burden of establishing fraud in the underlying transaction. . . ."), aff'd, 636 F.2d 30 (2d Cir. 1980).

**B.    Analysis**

The Bank argues that ACE's settlement of the Bowman claim is "void" because (1) ACE never sought relief from the bankruptcy court's automatic stay, nor requested bankruptcy court approval of its settlement of the Bowman claim (Def. Br. (Dkt. No. 64) at 9, 11-16); (2) ACE settled its own obligations, not those of its insured (id. at 12, 16-18); and (3) ACE had no right to reimbursement of the deductible, absent its insured's consent to the settlement or the Bowman court's approval, and ACE thus settled the Bowman claim in bad faith. (Id. at 12, 18-20, 25) According to the Bank, these failures mean that "ACE had no colorable right to anticipate compliance with the Bowman Draw Request." (Id. at 23)

**1.    The Bank's Burden to Show Material Fraud**

Although the Bank devotes many pages to explaining why ACE's conduct was improper – under bankruptcy law, under Louisiana state law, and under the terms of its

25

agreements with AFS – it devotes little attention to the critical issue in this case: whether ACE's conduct evinced intentional, material fraud. Indeed, as a general matter, the independence principle bars most of the Bank's arguments.

As discussed above, the independence principle "is predicated upon the fundamental policy that a letter of credit would lose its commercial vitality if before honoring drafts the issuer could look beyond the terms of the credit to the underlying contractual controversy or performance between its customer and the beneficiary." Township of Burlington, 1995 WL 384442, at *5 (citing KMW Int'l, 606 F.2d at 16). While the fraud defense under UCC Section 5-109 provides an exception to the independence principle, in order to defeat summary judgment, the Bank must show that ACE's actions were fraudulent, not merely mistaken. See Semetex Corp., 853 F. Supp. at 773 (fraud defense available "only where intentional fraud is shown, not where the party alleges improper performance or breach of warranty"); Bank of Canton, 509 F. Supp. at 1318 ("As the party defending against the claim for wrongful dishonoring of drafts drawn under a letter of credit, [the issuer] has the burden of establishing fraud in the underlying transaction."); cf. Oei v. Citibank, N.A., 957 F. Supp. 492, 519-20 (S.D.N.Y. 1997) (observing – in a letter-of-credit fraud case – that "'mere allegations of breach of contract do not give rise to a claim for fraud or fraudulent inducement[,]'" but that "[a] fraud claim may survive, however, where 'the allegations contained [in the fraud claim] are separate and distinct from those giving rise to the breach of contract claim'" (quoting Sudul v. Computer Outsourcing Servs., 868 F. Supp. 59, 61 (S.D.N.Y. 1994); Tuck Indus., Inc. v. Reichhold Chems., Inc., 151 A.D.2d 565, 566 (2d Dep't 1989))).

### 2.   ACE Acted Properly

The Bank has offered no evidence that ACE acted improperly, much less that it committed fraud.

a.      **ACE Did Not Violate the Bankruptcy Code**

The Bank argues that ACE's settlement of the Bowman claim is void because

ACE never sought relief from the bankruptcy court's automatic stay, nor requested bankruptcy

court approval of the settlement.  (Def. Br. (Dkt. No. 64) at 9, 11-16)

A bankruptcy petition serves to stay "the commencement or continuation,

including the issuance or employment of process, of a judicial, administrative, or other action or

proceeding against the debtor that was or could have been commenced before the

commencement of the case under [the Bankruptcy Code], or to recover a claim against the debtor

that arose before the commencement of the case under [the Bankruptcy Code]."  11 U.S.C

§ 362(a)(1).  The purpose of the automatic stay is to "provide[] the debtor with 'a breathing spell

from [its] creditors.'"  Teachers Ins. and Annuity Ass'n of America v. Butler, 803 F.2d 61, 64

(2d Cir. 1986).  "By its terms, section 362 applies only to debtors, property of the debtor, or

property of the estate, [however,] and [it] does not apply to stay proceedings against non-

debtors."  In re Calpine Corp., 365 B.R. 401, 408 (S.D.N.Y. 2007).

The Bank has cited no law demonstrating that ACE's payment of the Bowman

claim violated the bankrupty court's automatic stay.  Indeed, in Louisiana, tort plaintiffs such as

Bowman "have a substantive right of action against the insurer of [a] debtor [such as AFS], and

there is no necessity of naming, or attempting to recover against . . . the debtor."  Landry v.

Exxon Pipeline Co., 260 B.R. 769, 795 (Bankr. M.D. La. 2001).  In Landry, the court found that

the automatic stay provision in 11 U.S.C. § 362 does not apply to prevent direct actions against

insurers of a debtor in "direct action states such as Louisiana," because in these circumstances

the tort plaintiff is seeking to recover against the insurer and not against the debtor or its

property.  Landry, 260 B.R. at 795-96.

The Bank makes little effort to distinguish <u>Landry</u>.  Indeed, the Bank

acknowledges <u>Landry</u>'s holding "that proceeds used by an insurance company to pay its own

obligations are not property of the estate." (Def. Br. (Dkt. No. 64) at 14)  The Bank argues,

however, that <u>Landry</u> nevertheless "recognized that an insurance policy owned by a debtor is

property of the bankruptcy estate." (<u>Id.</u>)  While the <u>Landry</u> court observed that "[m]ost courts

addressing whether 'property of the estate' includes insurance policies have held that an

insurance policy owned by the debtor is property of the estate under 11 U.S.C. § 541," the court

also noted "whether the funds paid by the Insurers on account of the insurance policies are

property of the estate is an entirely different question." <u>Landry</u>, 260 B.R. at 784-85 (citations

omitted).  In the context of a direct action brought against an insurer, "[a] tort plaintiff is not

suing to enforce the debtor's policy rights[;] a tort plaintiff wishes to enforce the judgment

against the proceeds of that policy, in other words, funds payable by the insurer on account of the

insurer's contractual assumption of liability via its insurance policy with the debtor." <u>Id.</u> at 795.

In any event, to the extent the Bank is arguing that the automatic stay precludes

ACE from drawing down on the Letter of Credit, that argument is foreclosed by the following

language in this Court's August 3, 2012 opinion:

> "It is well settled that a letter of credit and the proceeds therefrom are not property
> of the debtor's bankruptcy estate." <u>In re Papio Keno Club, Inc.</u>, 247 B.R. 453,
> 459 (8th Cir. BAP 2000) (<u>citing</u> <u>In the Matter of Compton Corp</u>, 831 F.2d 586,
> 589 (5th Cir. 1987); <u>see also</u> Collier on Bankruptcy 362.03[8][b].  "When the
> issuer honors a proper draft under a letter of credit, it does so from its own assets
> and not from the assets of its customer which caused the letter of credit to be
> issued." <u>Id.</u>; <u>see also</u> <u>In re Elegant Merchandising, Inc.</u>, 41 B.R. 398, 399 (Bankr.
> S.D.N.Y. 1984) ("A letter of credit and its proceeds are not 'property of the
> estate' within the meaning of 11 U.S.C. 541, and therefore the payment of a letter
> of credit is not a transfer of assets in violation of the automatic stay provisions of
> 11 U.S.C. 362.  The letter of credit and its proceeds constitute property of the
> bank."); <u>Praedium II Broadstone, LLC v. Wall Street Strategies, Inc.</u>, No. 04 Civ.
> 3880(WHP), 2004 WL 2624678, at *2 (S.D.N.Y. 2004) ("neither a letter of credit
> nor its proceeds are property of a bankruptcy estate under Section 541(a) of the

[Bankruptcy] Code"); <u>In re Page</u>, 18 B.R. 713 (D.D.C. 1982) ("cashing the letter of credit will not divest the estate of property since neither the letter of credit nor its proceeds are property of the estate under the Bankruptcy Code"); <u>Lower Brule Const. Co. v. Sheesley's Plumbing & Heating Co., Inc.</u>, 84 B.R. 638, 644 (D.S.D. 1988) ("Proceeds of a letter of credit held by a creditor of the estate for the benefit of a third party are not property of the debtor's estate."); <u>In re Pine Tree Elec. Co.</u>, 34 B.R. 199 (Bankr. D. Me. 1983) ("In calling the letter of credit[, the beneficiary] is not acting to 'collect, assess, or recover a claim against the debtor that arose before the commencement of the case" in violation of 11 U.S.C. § 362(a)(6). Rather, [the beneficiary], in calling the letter of credit, seeks to enforce an independent, primary and direct obligation of the bank to it, the beneficiary of the letter of credit.") (citing <u>In re Page</u>, 18 B.R. 713)."

<u>ACE Am. Ins. Co. v. Bank of the Ozarks</u>, No. 11 Civ. 3146 (PGG), 2012 WL 3240239, at *6 (S.D.N.Y. Aug. 3, 2012).

The Bank's argument that the settlement of the Bowman claim was subject to Bankruptcy Rule 9019 is likewise without merit. Indeed, the U.S. Bankruptcy Court for the Eastern District of Arkansas – where AFS's bankruptcy proceeding is pending – has explained that, "by its own terms, Rule 9019(a) applies to trustees (including debtors-in-possession) and therefore does not require parties other than a trustee or debtor-in-possession to obtain court approval of settlements that do not affect the debtor's estate. . . ." <u>In re McKay</u>, 443 B.R. 511, 523 (Bankr. E.D. Ark. 2010). Accordingly, ACE's settlement of the Bowman claim was appropriate, notwithstanding AFS's pending bankruptcy proceeding.

### b.    ACE's Settlement of the Bowman Claim Was Proper

The Bank argues that ACE had no right to reimbursement of the deductible absent its insured's consent to the settlement or the <u>Bowman</u> court's approval, and that ACE settled the Bowman claim in bad faith. (Def. Br. (Dkt. No. 64) at 12, 18-20, 25) These arguments offer no proof that ACE committed fraud, however, and in any event are wrong on both the facts and the law.

In support of its argument that ACE had no right to reimbursement of the deductible, the Bank relies on Employers' Surplus Line Ins. Co. v. City of Baton Rouge, 362 So. 2d 561, 563 (La. 1978). There, the court interpreted a contract in which "the insurer's right to reimbursement from the insured . . . [was] conditioned upon the Insured's becoming 'legally obligated' to pay by reason of bodily injury or property damage claims resulting from an occurrence covered by the policy." Id. Given this feature of the contract, the court found:

> An insured becomes legally obligated to pay only as a result of a final judgment of court. In such an event, the insurer would be entitled to reimbursement from the insured under this provision of the policy. Absent such a final determination of the insured's legal obligation to pay by a court of law, the insurer would not be entitled to reimbursement. On the other hand, if the insurer settles the claims of third persons against the insured, as in the instant case, the insurer would be entitled to reimbursement from the insured provided the insured consented to the settlement agreement.

Employers' Surplus, 362 So. at 564-65. Of course, the court's interpretation of the phrase "legally obligated to pay" in Employers' Surplus cannot be divorced from the contract that was the subject of that lawsuit. Indeed, courts have found Employers' Surplus "factually distinguishable" where a contract contains a "specific endorsement . . . requir[ing] [the insured] to reimburse [the insurer] for all or part of the amount deductible if [the insurer] pays it 'to settle any claim or suit.'" Reliance Nat'l Indem. Co. v. Evans Cooperage Co., Civ. A. No. 95-1917, 1996 WL 288284, at *1 (E.D. La. May 29, 1996). In such contracts, the parties may "provide the insurer with unfettered discretion to investigate, negotiate and enter into settlement agreements which are binding on the insured." (Id.)

Here, the agreements between AFS and ACE require AFS to pay its deductible when ACE settles a claim for it under the Automobile Policy. Specifically, the deductible endorsement provides – in Item 4 – that ACE "will have the right at [its] sole discretion . . . [t]o pay any amounts within the Deductible Per Accident to settle any claim or 'suit[,]'" and that

AFS "shall promptly reimburse [ACE] for any sums [ACE] may have paid under Item 4." (ACE R. 56.1 Stmt. ¶¶ 39-40)  Moreover, the Collateral Agreement provides that AFS will pay "all . . . amounts the Insured is or may in the future be required to pay or reimburse in accordance with the terms and conditions of any Policies, . . . including without limitation the Insured's share of Paid Losses within applicable Deductible(s) . . . and the Insured's share of Allocated Loss Adjustment Expense as specified in the applicable Policy and/or Notice of Election[,]" as well as "all amounts the Insured is or may be obligated to pay to other parties but which are paid by [ACE]. . . ." (ACE Appendix (Dkt. No. 60-8), Ex. 7 at 2-3)  Accordingly, the agreements here do not fall within the principle stated in Employers' Surplus.  In short, ACE had a right to repayment of the deductible amount and committed no fraud in submitting the draw request reflecting that amount.

The Bank's arguments about bad faith settlement here also miss the point.  In order to defeat ACE's demand for payment on the Letter of Credit, the Bank must offer evidence that ACE committed fraud in submitting the draw request.  This is not an action between an insured and an insurer about whether the insurer settled a claim in bad faith.  And to treat this action founded on a letter of credit as if it were an insurance dispute would turn the law concerning letters of credit – discussed at length above – on its head.

In any event, the Bank has not shown that ACE settled the Bowman claim in bad faith.  The Bank relies on Commerce & Industry Insurance Co. v. North Shore Towers Management Inc., 162 Misc. 2d 778 (N.Y. Civ. Ct. 1994), in which the court observed that "[c]ases involving settlements within a deductible . . . present a potential conflict between the insured's interest in paying as small a part of the deductible as possible, and the insurer's interest in limiting its own exposure to liability by ensuring a settlement within the deductible, or in

31

avoiding litigation expenses to seek dismissal of a claim which may readily be settled within the deductible." Id. at 780.  Thus, "a bad-faith claim may be raised as to an insurer's settlement within policy limits which causes the insured to become liable for a deductible." Id. (citations omitted).  The court also observed, however, that "to prevail on a bad-faith claim, the insured must meet a demanding standard on which it has the burden of proof." Id. at 781.  "[A] showing must be made that the 'insurer's conduct constituted a 'gross disregard' of the insured's interests – that is, a deliberate or reckless failure to place on equal footing the interests of its insured with its own interests when considering a settlement offer.'" Id. (quoting Pavia v. State Farm Mut. Auto. Ins. Co., 82 N.Y.2d 445, 453 (1993)).

　　　　In this regard, "[t]he adequacy of the insurer's investigation of the claim and the potential liability of the insured to the claimant . . . [are] relevant to the bad-faith inquiry. . . ." Id. at 782.  Nevertheless, "in evaluating these aspects of the 'bad faith equation[,]' . . . the court cannot be called upon in effect to try the underlying claim." Id.  "'A determination of [bad] faith cannot be made to turn on an unavoidably speculative prognostication of the outcome of an unfinished [or never commenced] trial'"; instead, "the inquiry must be limited to whether the insurer had an 'arguably prudent' basis for its assessment of the insured's liability and for its position on settlement." Id. at 782-83 (quoting Orion Ins. Co. v. Gen. Elec. Co., 129 Misc. 2d 466, 475 (N.Y. Sup. Ct. 1985) (alterations in original), aff'd sub nom., U.S. Aviation Underwriters, Inc. v. Gen. Elec. Co., 125 A.D.2d 567 (2d Dep't 1986)).

　　　　Here, the Bank has offered no evidence that ACE acted against AFS's interests in settling the Bowman claim.  As discussed above, the Bowman claim stemmed from a multiple-car accident in which AFS's employee – a driver with a history of prior accidents – made a wide turn and struck the rear of another car, which in turn hit a second car that then hit a third car.

(ACE R. 56.1 Stmt. ¶ 68)  Given the driver's "failure to keep his vehicle under control" and "failure to watch where he was proceeding on the road," the claims adjuster determined that the likelihood of an adverse verdict was 100%.  (Id. ¶ 69)  ACE retained counsel, who then obtained medical records for the Bowmans and arranged for an independent medical examination.  (Id. ¶ 71)  Although ACE had been advised that the lawsuit was "unwinnable[,]" counsel managed to settle the case – after a mediation – for $100,000.  (Id.)  Nothing in this record suggests bad faith, much less fraud.

Although the Bank argues that ACE's settlement for the deductible amount is "suspicious[]" (Def. Br. (Dkt. No. 64) at 17), the Bank does not argue that ACE "engaged in a pattern of settling the claims for the amount of the deductible." Commerce, 162 Misc. 2d at 783. Indeed, in its opposition brief, the Bank states that it "is not asking this Court to evaluate the merits of the settlements." (Def. Br. (Dkt. No. 64) at 14 n.4)  The Bank nonetheless argues, however, that, "[b]y virtue of this settlement amount, ACE would avoid paying a penny towards the settlement of the Bowman claim while, at the same time, generating the maximum liability for Ozarks." (Id. at 17)  This argument, of course, ignores the fact that ACE incurred more than $31,000 in expenses in defending the Bowman action, which it is not likely to recover from the bankrupt AFS.  (ACE R. 56.1 Stmt. ¶ 72)

In sum, the Bank has not offered evidence demonstrating that ACE acted in bad faith in settling the Bowman claim, much less that it committed fraud in seeking payment on its draw request.[7]

---

[7]  The Bank argues that ACE's motion should be denied under Fed. R. Civ. P. 56(d) because ACE has not produced certain documents related to the Bowman settlement or ACE's estimated liability on current or future claims.  (Def. Br. (Dkt. No. 64) at 31-32)  In this regard, the Bank submitted a letter to the Court on October 23, 2013, contending that ACE had wrongfully

## IV.   **DECLARATORY JUDGMENT**

Plaintiff seeks a declaration that "defendant is obligated to honor and pay plaintiff the amount of any sight draft within seven banking days from the day of defendant's receipt of such sight draft provided that plaintiff presents defendant with a sight draft, drawn on defendant, bearing the clause 'Drawn under Credit No. 0706035392[.]"  (Dkt. No. 57)

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration. . . ."  28 U.S.C. § 2201(a).  The Act thus "confers on federal courts 'unique and substantial discretion in deciding whether to

---

withheld certain material on the grounds of attorney-client privilege and work product privilege. (See Dkt. No. 51)  The Bank sought the Court's permission to file a motion to compel discovery. (Id. at 4)  When ACE filed the instant motion, the Bank's letter was sub judice.

Fed. R. Civ. P. 56(d) provides that, "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."  Fed. R. Civ. P. 56(d).

The Bank's motion to compel discovery of the material withheld on privilege grounds is denied. (Dkt. No. 51)  It is obvious from the privilege and redaction logs submitted to the Court that the vast bulk of the material withheld by Plaintiff's counsel reflects communications of ACE's in-house counsel and outside counsel (including counsel in the instant case, bankruptcy counsel, and the Louisiana law firm representing ACE in the Bowman case).  (See Jacobs Nov. 22, 2013 Ltr.; Pikus Nov. 26, 2013 Ltr.)  As to the remaining redacted material, Plaintiff's counsel represents that it reflects legal advice or an attorney's thoughts or impressions.  (Jacobs Oct. 28, 2013 Ltr. (Dkt. No. 53) at 4 n.3)  There is no reason to distrust that representation under the circumstances of this case.

It is also worth noting that the Bank received, during discovery, access to all non-privileged materials contained in the Bowman claim file.  (Id. at 4)  Given that, as stated above, this action is not about whether ACE settled the Bowman claim in bad faith, there is no reason to believe that any documents withheld on privilege grounds would have been material to this Court's determination that ACE is entitled to payment on its draw request pursuant to the Letter of Credit.

declare the rights of litigants.'" Peconic Baykeeper, Inc. v. Suffolk County, 600 F.3d 180, 187

(2d Cir. 2010) (quoting Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995)). In determining

whether declaratory relief is warranted, "[t]he court must consider whether a declaratory

judgment will (1) 'serve a useful purpose in clarifying and settling the legal relations in issue;' or

(2) 'afford relief from the uncertainty, insecurity, and controversy giving rise to the

proceeding.'" Camofi Master LDC v. College P'Ship, Inc., 452 F. Supp. 2d 462, 480 (S.D.N.Y.

2006) (quoting Cont'l Cas. Co. v. Coastal Sav. Bank, 977 F.2d 734, 737 (2d Cir. 1992)). When

the court in its discretion determines that either of these conditions is satisfied, it is "'required to

entertain a declaratory judgment action. . . .'" Cosa Instrument Corp. v. Hobre Instruments BV,

698 F. Supp. 2d 345, 350 (E.D.N.Y. 2010) (emphasis in original) (quoting Starter Corp. v.

Converse, Inc., 84 F.3d 592, 597 (2d Cir. 1996)).

     Here, it is clear that there is an "actual controversy" and that a grant of declaratory

relief would "serve a useful purpose in clarifying and settling the legal relations in issue."

Camofi Master LDC, 452 F. Supp. 2d at 480. As noted above, this is the second lawsuit arising

from the parties' ongoing disagreement about the Bank's obligation to satisfy ACE's draw

requests on the Letter of Credit. The instant case presents the same issues as those in the prior

action before Judge Kaplan (09 Civ. 8938 (LAK)), in which ACE also claimed that the Bank had

failed and/or refused to pay certain then-pending draw requests. (09 Civ. 8938 (LAK), Dkt. No.

5 (Amended Complaint)) Judge Kaplan found that "it is quite clear that there is a real

disagreement between ACE and the Bank," but he dismissed the declaratory judgment claim on

March 18, 2010, because he believed that the Letter of Credit would be terminated by the Bank

effective June 1, 2010. (09 Civ. 8938 (LAK), Dkt. No. 21) The Letter of Credit was not

terminated, however, and the identical legal issues have resurfaced. Moreover, since this action

was filed, ACE has submitted – and the Bank has refused to honor – two additional draw requests related to the Automobile Policy.  (ACE R. 56.1 Stmt. ¶¶ 96, 105, 107)  Under these circumstances, a declaratory judgment would "serve a useful purpose in clarifying and settling the legal relations in issue" and "afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."  Camofi Master LDC, 452 F. Supp. 2d at 480.

        Accordingly, based on the analysis of the Letter of Credit set forth above, the Court declares that the Bank is obligated to honor and pay ACE the amount of any sight draft within seven banking days from the day of the Bank's receipt of such sight draft, provided that ACE presents the Bank with a sight draft, drawn on the Bank, bearing the clause "Drawn under Credit No. 0706035392."

## CONCLUSION

        For the reasons stated above, Plaintiff's motion for summary judgment is granted. The Clerk of the Court is directed to terminate the motions (Dkt. Nos. 51, 57), and to close this case.

Dated: New York, New York
      September 30, 2014

                      SO ORDERED.

                      _____
                      Paul G. Gardephe
                      United States District Judge